```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF GEORGIA
                       ATHENS DIVISION
```

MAHESH SAMPAT,                    *

         Plaintiff,               *

vs.                               *
                                       CASE NO. 3:04-CV-077 (CDL)
ABB INC.,                         *

         Defendant.               *

## O R D E R

This case arises from Defendant's termination of Plaintiff's employment. Plaintiff claims that Defendant fired him because of his race and national origin. Defendant responds that it discharged him because he violated legitimate nondiscriminatory company policy, and Defendant has consequently filed a Motion for Summary Judgment (Doc. 47) on Plaintiff's Title VII and § 1981 claims.[1]  For the following reasons, Defendant's motion is granted.

## BACKGROUND

The facts viewed in the light most favorable to Plaintiff are as follows:

---

[1] In his original Complaint, Plaintiff also raised a claim for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*.  In response to this claim, Defendant states that "Plaintiff's counsel recently informed [Defendant] that Plaintiff has abandoned his age discrimination claim, and Plaintiff's counsel expressly authorized [Defendant] to state that fact in [its] Motion for Summary Judgment."  (Def.'s Mot. Summ. J. 1.)  The Court finds that Plaintiff has abandoned his ADEA claim which is hereby dismissed with prejudice.

Plaintiff, Mahesh Sampat, was employed by ABB Inc. from April 1994 until his termination in September 2003. Beginning in July 2002, Plaintiff was the department manager for the manufacturing division of ABB's United States Corporate Research Center ("USCRC"). His direct supervisor was the director of USCRC, Le Tang, who reported to the global director for ABB Corporate Research, Bernard Eschermann. (*See* Eschermann Depo. 7:20-8:4, Aug. 5, 2005; Tang Depo. 11:18-20, July 18, 2005.) Prior to the events which led to his termination, Plaintiff had never received an unsatisfactory performance review and had never been subject to a disciplinary measure. (Pl.'s Decl. ¶ 7, Feb. 1, 2007.)

## I. Allegations of Misconduct and the Investigative Report

In August 2003, ABB's ethics hotline received a fax complaining about Plaintiff's alleged violations of ABB's business conduct standards. (Keating Depo. 23:23, Aug. 29, 2005; Downs Depo. 16:23-17:3, May 9, 2006.) Pursuant to company policy, the allegations contained in the complaint were submitted to ABB's ethics investigation unit. (Downs Depo. 13:6-15.) The investigation unit is separate from the operational units of ABB, and is headed by Kerry Keating and Kevin Downs. Mr. Keating, as director for the Office of Ethics, is responsible for conducting special investigations or reviews for ABB North America. (Keating Depo. 10:22-11:6.) Mr. Downs is responsible for worldwide special investigative activity. (Downs Depo. 11:20-12:13.) Together, Messrs. Keating and

2

Downs launched a formal investigation of the ethics violations alleged against Plaintiff.

   A.   Conflict of Interest

The first allegation against Plaintiff was that he had violated ABB's conflict of interest policy by employing his nephew, Naishand Kanani, as a contract employee in his direct chain of command. The company's conflict policy states:

> All employees have a duty to avoid financial, business, or other relationships which might be opposed to the interests of [ABB] or might cause a conflict . . . . Employees should conduct themselves in a manner that avoids *even the appearance of conflict* between their personal interests and those of [ABB].
>
> To protect yourself and [ABB] from actual or apparent conflicts:
>
> - Get written clearance from your supervisor before doing business on [ABB]'s behalf with any company in which you or a close family member may benefit from your actions.
>
>         . . . .
>
> - Family members and members of the same household (including employees and also *independent contractors . . .* ) should not be assigned to positions in which one member reports directly *or indirectly* to another member. Similarly, assignments to positions must be made so that one member of a family or household has *no signatory authority* over another member, regarding purchases, contract awards, or [] personnel-related actions . . . .

(Pl.'s Depo. Ex. 1 at 6-8, June 6, 2005) (emphasis added). The policy is presented to employees in a company handbook titled "Standards of Business Conduct," and Plaintiff admits that he read

3

and agreed with the policies in the handbook. (*Id.* at 80:11-81:4; *see also* Pl.'s Objection & Resp. to Def.'s Statement of Undisputed Material Facts 13-14.)

Mr. Kanani is Plaintiff's wife's nephew and provided contract labor for Plaintiff's division of USCRC.[2] In 1999, Plaintiff approached a USCRC research engineer, Tarek El Hadidi, for the purpose of requesting that Mr. El Hadidi consider Mr. Kanani for a position with UBICS, an agency that provided ABB with contract labor. (El Hadidi Depo. 7:18-8:1, Aug. 22, 2005.) By early 2000, Mr. Kanani was working on projects for the corporate research department of ABB. (*Id.* at 9:11-16.) Mr. Kanani reported to USCRC's Senior Research and Development Engineer Randy Avery, who directly reported to Plaintiff. (Pl.'s Decl. ¶ 19; Avery Decl. ¶¶ 3, 10-17, Jan. 25, 2007.) Although the parties dispute the date on which ABB records first reflect Mr. Kanani's contract status, it is clear that Plaintiff personally signed a contract authorizing ABB to pay Mr. Kanani for his work in May 2003. (Pl.'s Depo. 32:14-33:2.) It is undisputed that Plaintiff never submitted a written request or notification to his supervisors disclosing his relation to Mr. Kanani.[3] (*Id.* at 176:20-177:9.)

---

[2] Plaintiff contends that he was unaware that his wife's nephew qualified as a "close family member." Plaintiff describes himself as Mr. Kanani's "mahsa." (Pl.'s Depo. 75:17-19.) According to Plaintiff, there is "a very distinct difference between uncle and mahsa." (*Id.* at 75:22-25.)

[3] Messrs. El Hadidi and Avery contend that "everybody in the office knew" about the familial relationship and that Plaintiff "did not make any attempt to conceal this fact." (El Hadidi Depo. 14:16-15:6; Avery Decl. ¶ 9.)

4

B.  Accounting Discrepancies

The investigation also involved an allegation that Plaintiff violated budgeting rules involving the improper use of client funds. Specifically, Plaintiff was accused of instructing that $16,656 be billed for labor provided in 2003 against a project that had been closed at the end of 2002. (Keating Depo. 27:12-28:5, Ex. 2.) The money was used to pay Mr. Kanani, and was taken from the accrual of excess funds which had been allocated for intellectual property disclosures in 2002. (*Id.* at Ex. 2.) Plaintiff claims that "[i]t was not [his] job or area of expertise to make determinations as to how money should be categorized in the ABB accounting system[,]" and that "[t]here was no reason [he] would have requested project funding be set aside . . . for Intellectual Property since there were no Invention Disclosures [to] file under [that] project." (Pl.'s Decl. ¶¶ 22-3.) In his deposition, however, Plaintiff admitted that he knew that "the money that was spent to pay the contractor [Mr. Kanani] in 2003 was the money which was set aside of [sic] a project which ended in 2002 and [for which] there was still some work left to be done . . . ." (Pl.'s Depo. 42:10-13.) As the investigative report indicated, this action clearly violated USCRC's generally accepted accounting practices. (*See* Eschermann Depo. 17:3-18:20; Tang Depo. 60:2-61:13; Buckhalter Depo. 73:2-23, Aug. 2, 2005.)

5

C.  Insubordination

Finally, the investigation revealed evidence that Plaintiff had violated the direction of his superiors by employing Mr. Kanani as a contract laborer in 2003. In December 2002, Mr. Eschermann issued a directive, which Plaintiff received, stating that no employee should budget for or retain contract work for projects funded by ABB Corporate Research in 2003. (Eschermann Depo. 17:12-15, 50:20-51:11, 54:21-55:8; Keating Depo. Ex. 2.) On several occasions thereafter, Plaintiff's supervisor, Mr. Tang, asked whether he had employed any contractors in 2003. (Tang Depo. 68:12-69:21, 87:4-12; Keating Depo. Ex. 2.) Although Mr. Kanani and another contractor continued to provide services to USCRC in early 2003, Plaintiff failed to disclose this fact to his supervisors and authorized payment to Mr. Kanani in May 2003. (*Id.*) Plaintiff explained that he had interpreted Mr. Eschermann's directive to permit the use of contract labor in certain circumstances. (Pl.'s Depo. 248:8-22.) Although Plaintiff never received specific approval to use contractors in 2003, he believed that Mr. Eschermann had implicitly authorized their use at a meeting between himself and Messrs. Eschermann and Tang in January 2003. (*Id.* at 38:20-1, 252:4-13, 254:4-18.) At that meeting, Plaintiff presented to Mr. Eschermann a chart representing Plaintiff's interpretation of Mr. Eschermann's directive. (*Id.*) Although Messrs. Eschermann and Tang deny that Plaintiff was justified in doing so, he believed that Mr. Eschermann "approved

6

[the] chart[,]" and that this approval authorized Plaintiff's use of contractors in 2003.  (*Id.* at 38:20-1.)

**II.  Decision to Terminate Plaintiff's Employment**

At the conclusion of the ethics investigation, Messrs. Keating and Downs prepared an investigative summary report outlining the findings of their investigation.  (Keating Depo. Ex. 2.)  The report did not make a recommendation as to how or whether Plaintiff should be disciplined.  (Downs Depo. 20:24-5, 22:1-5, 27:18-28:2.)  As head of USCRC and Plaintiff's direct supervisors, Messrs. Eschermann and Tang scheduled a review meeting, requesting the presence of Cheryl Sulborski, vice president of human resources, and Stuart Saltman, ABB's corporate legal counsel.  After reviewing the findings contained in the investigation report, Messrs. Eschermann and Tang decided that it was necessary to terminate Plaintiff's employment.  (Eschermann Depo. 12:17-13:13, 22:23; Tang Depo. 75:9-11.)  It is clear that Messrs. Eschermann and Tang were the sole decisionmakers regarding Plaintiff's discharge (*id.*), and that they relied on the truth of the information presented in the investigative summary report in making this decision.  (Eschermann Depo. 16:17-25; Tang Depo. 40:8-11, 41:18-19, 74:12-14, 95:3-6.)  Upon Plaintiff's termination, another USCRC department manager, John Sutton, assumed Plaintiff's employment duties.

Plaintiff now claims that the asserted reasons for his termination were "blown out of proportion," and that "the only [true]

7

reason [for his termination that he] could come up with is [his] background[.]" (Pl.'s Depo. 22:15, 26:1-3.) He filed the present lawsuit seeking relief under Title VII and 42 U.S.C. § 1981 for the alleged discrimination he suffered as a result of his race and national origin. In the presently pending motion, Defendant argues that it is entitled to summary judgment on each of these claims.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). This burden can be met by showing that the non-moving party will be unable to "establish the existence of an element essential to [the non-moving party's] case, and on which [the non-moving party] will bear the burden of proof at trial. *Id.* at 322.

Once the moving party has met its burden, the burden shifts to the non-moving party to show that there *is* a genuine issue of material fact. *Id.* at 324. A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue if the evidence would

allow a reasonable jury to find for the non-moving party. *Id.* In other words, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

In determining if the parties have met their respective burdens, the Court may draw inferences from undisputed facts. The Court resolves "all reasonable doubts about the facts in favor of the non-movant, and draws all justifiable inferences in his favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Additionally, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).

## II. Title VII Claim

Plaintiff claims that he was discriminated against because of his race and national origin and that this discrimination is actionable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Specifically, Plaintiff contends that he was subjected to disparate treatment because of his race and national origin and that this discrimination resulted in his termination from ABB. Under Title VII, it is Plaintiff's burden to show by a preponderance of the evidence that Defendant intentionally engaged in

9

unlawful discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993).

Here, Plaintiff relies on circumstantial evidence to show that Defendant discriminated against him because of his race and national origin. In order to bring a claim for disparate treatment based on circumstantial evidence, the plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff can support a prima facie case, a presumption of discriminatory intent is created. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden then shifts to the defendant to articulate a legitimate non-discriminatory reason for the alleged discriminatory behavior. *McDonnell Douglas*, 411 U.S. at 802; *Rojas v. Florida*, 285 F.3d 1339, 1342 (2002). If the defendant carries this burden, the presumption of discrimination is rebutted. *Burdine*, 450 U.S. at 255. However, the plaintiff can still defeat summary judgement by presenting evidence sufficient to create a genuine issue of material fact as to whether the proffered legitimate non-discriminatory reason is merely pretext for a discriminatory decision. *McDonnell Douglas*, 411 U.S. at 804; *Rojas*, 285 F.3d at 1342.

A. Prima Facie Case

In order to establish a prima facie case of discrimination based on race or national origin, Plaintiff must establish (1) that he is a member of a protected class, (2) that he was qualified for the job,

(3) that he was subjected to an adverse employment action, and (4) that he was replaced by someone outside his protected class or was treated differently than similarly situated employees. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *Hawkins v. CECO Corp.*, 883 F.2d 977, 982 (11th Cir. 1989). As a native of India and self-described "person of color[,]" (*see* Compl. ¶ 10) it is undisputed that Plaintiff belongs to a protected class. Additionally, Defendant concedes that Plaintiff suffered an adverse employment action in that he was terminated from his position at ABB. Furthermore, the Court assumes for the purposes of this part of the analysis that Plaintiff was qualified for the position from which he was discharged. The question, therefore, is whether Plaintiff's evidence shows that he was replaced by someone outside his protected class or was treated differently than similarly situated employees. *See Hawkins*, 883 F.2d at 982.

To establish the final prong of his prima facie case of discrimination, Plaintiff argues that he was "replaced" by John Sutton, a Caucasian American. The record shows that in late 2002, "[USCRC] was restructured . . . [and Mr.] Eschermann directed that the number of [department] managers shrink from 3 to 2." (Pl.'s Decl. ¶ 31.) At that time, "[t]he three managers were [Plaintiff], Le Tang, and John Sutton." Plaintiff contends that upper ABB management initially opted to eliminate Mr. Sutton's position and to retain both Plaintiff and Mr. Tang. (*See id.* at ¶¶ 32-4.) Once it

11

was determined that Plaintiff ought to be terminated, however, Messrs. Eschermann and Tang simply opted to eliminate Plaintiff's position rather than Mr. Sutton's. Thus, the circumstances suggest that Plaintiff "was not replaced by anyone[.]" *Gamble v. Aramark Unif. Servs.*, 132 Fed. App'x 263, 267 (11th Cir. 2005); *see also Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995) (noting that where a discharge results from a reduction in force, the plaintiff must show that he was "qualified for another position at the time of termination, and [] that the employer intended to discriminate in failing to consider the plaintiff for another position."). Defendant, however, presents no argument to rebut Plaintiff's claim that he was "replaced" by Mr. Sutton. Additionally, the record includes evidence that "[t]he individuals who had reported to [Plaintiff] reported to Mr. Sutton after [Plaintiff] was terminated." (Avery Decl. ¶ 28.) Based on the foregoing, the Court for purposes of the pending motion concludes that Plaintiff was "replaced" by Mr. Sutton, a Caucasian American. Therefore, he has established a prima facie case of discrimination on the basis of race and national origin.

    B.    Legitimate Non-discriminatory Reasons

Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Wilson*, 376 F.3d at 1087. The defendant "need not persuade the court that [it

was] actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. Instead, the defendant must only "raise[] a genuine issue of fact as to whether [they] discriminated against the plaintiff." *Id.*

Here, Defendant has clearly met its burden of articulating legitimate, non-discriminatory reasons for terminating Plaintiff's employment. First, after reviewing the investigative summary of the complaints against Plaintiff, Messrs. Eschermann and Tang determined that Plaintiff violated company policy regarding conflicts of interest by authorizing his nephew to provide contract work for USCRC without having provided notice to upper management of the familial connection. (*See* Eschermann Depo. 12:25-13:2; Tang Depo. 45:14-16.) Additionally, Mr. Tang noted that employing a family member without first obtaining the consent of upper management "is enough to [support] a decision" to terminate Plaintiff's employment. (Tang Depo. 45:14-46:9.)

Second, Defendant contends that Plaintiff also violated company rules regarding generally accepted accounting practices. Messrs. Eschermann and Tang both explained that it was inappropriate for Plaintiff to use money remaining in the 2002 budget to pay for contract labor costs incurred in 2003. (Eschermann Depo. 17:6-12; Tang Depo. 60:21-61:8.) Mr. Tang also indicated that Plaintiff was aware of the fact that "IP money[] . . . is set aside for IP and is [not] supposed to be [used for] labor." (Tang Depo. 86:13-14.) Furthermore, Mr. Eschermann testified that it was made clear to

13

Plaintiff that he lacked the authority to use department funds to employ *any* contract labor in 2003. (Eschermann Depo. 13:16-19, 17:12-15; *see also* Tang Depo. 57:21-58:12, 66:5-9.)  Finally, Mr. Tang contends that when asked "several times," Plaintiff concealed his use of contractors in 2003. (Tang Depo. 68:12-69:21, 87:4-16.)  Clearly, Defendant has articulated legitimate, non-discriminatory reasons for Plaintiff's discharge.

C. Pretext

Presented with these legitimate, non-discriminatory reasons, the burden shifts back to Plaintiff to show that Defendant's reasons for his termination are mere pretext for discrimination. *Burdine*, 450 U.S. at 256; *Wilson*, 376 F.3d at 1090.  To satisfy this burden, Plaintiff must present evidence "sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons." *Schoenfeld v. Babbit*, 168 F.3d 1257, 1269 (11th Cir. 1999).  The Court is "not interested in whether [Defendant's] conclusion is a correct one, but whether it is an honest one." *Rojas*, 285 F.3d at 1342.

The Court notes that although Plaintiff argues that he was terminated because of his race and national origin, he does not clearly articulate whom he believes actually harbored the discriminatory animus.  He appears to allege that the anonymous tipster was motivated by Plaintiff's race and national origin to call the ethics hotline, and that the ethics investigation team initiated

14

the investigation with knowledge of the initial caller's discriminatory intent. Plaintiff does not allege, however, that either the individual investigators or the ultimate decisionmakers were motivated by a desire to discriminate. He does contend that these individuals acted as the "cat's paw" for the initial complainant, although this argument mischaracterizes the "cat's paw" analysis, and Plaintiff's reliance upon it is rejected by the Court.[4]

It is also unclear whether Plaintiff relies upon "comparator evidence" in support of his argument that Defendant's articulated reasons were pretextual. Such evidence is typically restricted to establishing a prima facie case of discrimination. In this case, the Court found that Plaintiff was replaced by someone outside of his protected class and thus Plaintiff was able to establish a prima facie case. Therefore, it was unnecessary to consider whether valid comparator evidence existed in support of Plaintiff's prima facie

---

[4] The "cat's paw" theory of analysis only applies to situations in which "the biased recommender and the actual decisionmaker are not the same person or persons, . . . [and] the underlying employee misconduct identified in the recommendation[] was an actual cause of the other party's decision to terminate the employee." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999) (*citing Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1248 (11th Cir. 1998)). Under such circumstances, the plaintiff claiming discrimination may establish the necessary causation by showing "that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee." *Id.* at 1332. This theory of analysis does not apply in this case because (1) the ethics investigation team *did* conduct an independent investigation of the hotline complaint and (2) the investigators simply collected the facts and did not make a recommendation to the ultimate decisionmakers. Thus, Plaintiff cannot show that either the investigative team or the ultimate decisionmakers acted as the "cat's paw" for a biased recommender.

15

case. However, to the extent that Plaintiff relies upon such evidence to show pretext, the Court finds that Plaintiff has failed to produce evidence that a valid comparator was treated differently from him.

Plaintiff contends that he was treated differently from Wilbur Meier, a similarly situated ABB employee who engaged in conduct similar to Plaintiff but was not terminated. Plaintiff asserts generally that Mr. Meier, a Caucasian American, was (1) employed by ABB as a manager, (2) engaged in conduct which clearly violated the conflict of interest policy, and (3) was not terminated from ABB despite this policy violation. Therefore, Plaintiff argues, Mr. Meier was a similarly situated employee who was treated differently than Plaintiff.

In order for an employee to be similarly situated to the plaintiff, that employee must be "similarly situated in all relevant respects." *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003)(quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)). The comparator employee should be "involved in or accused of the same or similar conduct" and be "disciplined in [a] different way[]." *Id.* Additionally, the comparator employee must have "very similar job-related characteristics" to the plaintiff, and be "in a similar situation to the plaintiff." *MacPherson v. Univ. Of Montevallo*, 922 F.2d 766, 774 (11th Cir. 1991).

In the present case, Mr. Meier was employed as a corporate research program manager. For purposes of this analysis, the Court will assume that he had "very similar job-related characteristics" and was "in a similar situation to" Plaintiff. *Id.* For Plaintiff to satisfy the similar offense prong, however, he must produce evidence that "the comparator's misconduct [was] nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (internal quotation marks and citation omitted). Since Mr. Meier was not accused of engaging in conduct "nearly identical" to Plaintiff's, he is not a proper comparator and cannot be used to show that Defendant's reasons for firing Plaintiff were pretextual.

First, the nature of the conflict underlying Mr. Meier's investigation was entirely different from the conflict underlying Plaintiff's investigation. Plaintiff was investigated for inappropriately employing a family member; Mr. Meier was investigated for failing to disclose a lingering financial interest in a company with which he engaged in business on behalf of ABB.[5] Second, there is no evidence that Mr. Meier, like Plaintiff, was determined to have violated multiple company policies. Although Mr. Tang testified that

---

[5]The specific language which formed the basis for Mr. Meier's investigation prohibited ABB employees from "mak[ing] or hold[ing] any investment in any business which is a supplier, customer, or competitor unless [it] is a public corporation . . . ." (Pl.'s Depo. Ex. 1 at 8.)

17

a conflicts violation was "enough to [support] a decision" to discharge an employee, (Tang Depo. 45:14-46:9), it is clear that Messrs. Eschermann and Tang also considered Plaintiff's accounting discrepancies and apparent insubordination in deciding to terminate his employment. Therefore, Mr. Meier is not a similarly situated employee who was treated differently for engaging in similar behavior, and Plaintiff has failed to establish that he is a proper comparator for the purpose of creating a genuine issue of fact on the question of pretext.[6]

In short, Plaintiff has failed to produce evidence from which a reasonable fact finder could conclude that Defendant's legitimate, non-discriminatory reasons for his discharge were mere pretext for discrimination. Consequently, Defendant is entitled to summary judgment on Plaintiff's Title VII claim.

**III. Section 1981 Claim**

---

[6]Plaintiff also asserts that Defendant's reasons for discharge must be pretextual because they were "blown out of proportion." (Pl.'s Depo. 22:15, June 6, 2005.) By Plaintiff's logic, it was unreasonable for Defendant to terminate his employment for the reasons stated. However, the relevant inquiry is not "whether [Defendant's] conclusion [was] a correct one, but whether it [was] an honest one." *Rojas*, 285 F.3d at 1342. Plaintiff's evidence is completely void of any indication that the decision to terminate his employment was based on his race or national origin. In fact, Plaintiff admits that he believes that he was discriminated against only because it was "the only reason [he] could come up with[.]" (Pl.'s Depo. 26:1-2.) Put simply, Plaintiff provides nothing to support his belief that he was discriminated against because of his race and national origin. Although Plaintiff may think that his termination was inappropriately harsh, this Court will not permit him to use Title VII to "second-guess[] [his] employers' reasonable [and non-discriminatory] decision[]" to terminate Plaintiff's employment. *See Silvera*, 244 F.3d at 1259.

18

Plaintiff also claims that he suffered discrimination because of his race and national origin in violation of 42 U.S.C. § 1981. Since § 1981 and Title VII "have the same requirements of proof and [] the same analytical framework," the Court's analysis of Plaintiff's Title VII claim also applies to his § 1981 claim. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Therefore, for the reasons stated above, Defendant is entitled to summary judgment on Plaintiff's 42 U.S.C. § 1981 claim.

**IV. Section 1988 Attorney's Fees**

Plaintiff is not the prevailing party for his Title VII or his § 1981 claims. Consequently, he is not entitled to recover attorney's fees under 42 U.S.C. § 1988(b).

CONCLUSION

For the reasons stated in this Order, the Court grants Defendant's Motion for Summary Judgment (Doc. 47).

IT IS SO ORDERED, this 30th day of March, 2007.

S/Clay D. Land  
CLAY D. LAND  
UNITED STATES DISTRICT JUDGE